UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS
SEP 02 2016
JAMES W. McCORMACK, CLERK
By: _____ DEP CLERK

DAVID A. STEBBINS                                             PLAINTIFF

VS.                       CASE NO. 16-  4:16-cv-638-BRW

STATE OF ARKANSAS                                             DEFENDANT

This case assigned to District Judge Wilson
and to Magistrate Judge Deere

**COMPLAINT AND JURY DEMAND**

Comes now, pro se Plaintiff David Stebbins, who hereby submits the following Complaint and Jury Demand for retaliation in violation of Sec. 503 of the Americans with Disabilities Act, as well as disability discrimination in violation of Title II of the Americans with Disabilities Act.

**SECTION I: JURISDICTION AND VENUE**

1. This Court has "federal question" subject-matter jurisdiction. See 28 USC § 1331.

2. This court has personal jurisdiction and proper venue because the Defendant – the State of Arkansas – is headquartered in Little Rock, and all defendants are residents of the State of Arkansas. See 28 USC § 1391(b)(1).

**SECTION II: SOVEREIGN IMMUNITY**

3. Because this is sure to be a major issue, let's get this out of the way right now.

4. First of all, there is no Eleventh Amendment immunity. See Tennessee v. Lane, 541 U.S. 509 (2004).

5. Second, there is no judicial immunity, because only the State is being sued in this case. State governments, when not protected by the Eleventh Amendment, do not have judicial immunity. Forget whether this is an exception, or whether it's been waived in this case; state governments never had judicial immunity to begin with. "Official immunities (judicial,

legislative, absolute, qualified, quasi, and so on) are personal defenses designed to protect the finances of public officials whose salaries do not compensate them for the risks of liability under vague and hard-to-foresee constitutional doctrines. That justification does not apply to suits against units of state or local government, which can tap the public fisc." See *Hernandez v. Sheahan*, 455 F. 3d 772 (7th Cir. 2006). Although that precedent is not binding in the 8th Circuit, it is citing the Supreme Court precedent of *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), which *is* binding on this court.

6.      Third, there is ample precedent showing that states, when not protected by the eleventh amendment, were intended to be held liable for the acts of their judges. See *Livingston v. Guice*, 68 F. 3d 460 (4th Cir. 1995) ("In commenting that the plaintiff had 'failed to allege even a single independent act or duty to act by the State ... the district court disregarded [the plaintiff]'s contention that the acts of [the judge] are, in fact, acts of the State as well. As the Supreme Court noted in *Pulliam*, a State acts only through its legislative, executive, or judicial authorities. In barring [the plaintiff] from the courtroom, there is no question that [the judge] was acting as the State's representative. As [the Plaintiff] points out, the office of Superior Court Judge is created by the [State] Constitution, judges' salaries are determined by the General Assembly, and the judges possess 'statewide jurisdiction and duties." (citations and quotations omitted). See also *Guttman v. Khalsa*, 446 F. 3d 1027 (10th Cir. 2006). See also *Duvall v. County of Kitsap*, 260 F. 3d 1124, 1141 (9th Cir. 2001) ("When a plaintiff brings a direct suit under either the Rehabilitation Act or Title II of the ADA against a [government], the public entity is liable for the vicarious acts of its employees. We have held that, under § 504 of the Rehabilitation Act (upon which the ADA was explicitly modeled), we apply the doctrine of respondeat superior to claims brought directly under the statute"). See also *Mason v. Stallings*, 82 F. 3d 1007, 1009 (11th Cir.

1996) ("We agree with the Seventh Circuit that the 'agent' language was included to ensure respondeat superior liability of the employer for the acts of its agents, a theory of liability not available for 42 U.S.C. § 1983 claims")

7. Lastly, this case was, indeed, filed in this court before. However, it was only dismissed without prejudice. See Case No. 4:15CV0036 JLH. It was dismissed less than a year ago, which means that the savings statute is still in effect. The reason behind the dismissal was because "Plaintiff does not, however, allege the State of Arkansas committed any wrongdoing other than employing these judges" (see Doc. 25 p. 7 in that case). The legal citations in the above two paragraphs clearly show that this is not the law of the land; in fact, the law of the land is the complete opposite.

8. Therefore, if Plaintiff alleges sufficient facts, he should be entitled to proceed on this claim.

## SECTION III: FACTUAL ALLEGATIONS

### Sub-Section 1: Plaintiff's Statutorily Protected Activities

9. Plaintiff – a resident oft he city of Harrison, Arkansas and of Boone County, Arkansas – has Asperger Syndrome, a disability which severely hinders his ability to socialize with others, make friends, get jobs, get a girlfriend, etc.

10. Because this disability is not obvious (like blindness or paraplegia), many persons do not realize that it even IS a disability, and thus, they believe that they have no obligation under the Americans with Disabilities Act to provide reasonable accommodations for it. This leads to many times when Plaintiff does not get the reasonable accommodations he is supposed to be legally entitled to. Thus, Plaintiff was faced, many many times, with two options: Either suck it up and let people do whatever they want to him and walk all over him, or file suit in federal court.

Plaintiff quickly decided that the former was 100% out of the question.

11.   Plaintiff could not afford to hire an attorney on an hourly basis, and because discrimination is an extremely complication area of law (indeed, the Defendant's mindset is an essential element), it is extremely rare for an attorney to take a case on contingency, especially when the Defendants in those cases honestly believe that they were doing nothing wrong.

12.   Thus, Plaintiff had no choice but to represent himself pro se in these matters.

13.   A list of the ADA cases where Plaintiff represented himself, prior to November 24, 2011, are ...

(a)   Stebbins v. Reliable Heat & Air, LLC, Case No. 10-3305 in the U.S. District Court for the Western District of Missouri. This lawsuit is in good faith because Plaintiff was doing the best he could at his job, but the employer – by his own admission – made absolutely no attempt to accommodate Plaintiff's Asperger Syndrome. This resulted in a few misunderstandings between Plaintiff and the employer's customers that could easily have been avoided if the employer had provided reasonable accommodations.

(b)   Stebbins v. University of Arkansas, Case No. 10-5125 in the U.S. District Court for the Western District of Arkansas. This lawsuit was filed in good faith because Plaintiff – who was an emotional wreck at the time out of fear of possibly hurting someone – made some statements which the University of Arkansas perceived as a threat. Plaintiff tried to explain that, because of his Aspergers, sometimes things can come out wrong, but the UA did not want to listen.

(c)   Stebbins v. Mid States Promotions, Case No. 10-3041 in the U.S. District Court for the Western District of Arkansas. This lawsuit was filed in good faith because Owner Jason Jones threw Plaintiff out of his wrestling school in retaliation for some allegedly

disrespectful remark Plaintiff's allegedly made about one of Jones' best wrestlers, and never even attempted to provide the extremely reasonable accommodation of allowing Plaintiff to apologize.

(d)     Stebbins v. Wal-Mart Stores Arkansas, LLC, Case No. 10-3086 in the U.S. District Court for the Western District of Arkansas. This lawsuit was filed in good faith because, although Plaintiff was not applying for any position that required him to interact with customers (having learned his lesson with Reliable Heat & Air), Wal-Mart's computerized employment application test nevertheless asked Plaintiff questions regarding how to be courteous with customers that involved position that Plaintiff was not even applying for. This, in Plaintiff's opinion, had the disparate impact of discriminating against people with Asperger Syndrome.

(e)     Stebbins v. Full Sail University, Case No. 10-3072 in the U.S. District Court for the Western District of Arkansas. This lawsuit was filed in good faith because Plaintiff's attempts to communicate with the school's enrollment staff fell through the cracks because of Plaintiff's Aspergers, and the school refused to provide any accommodation whatsoever for Plaintiff's lack of social skills.

(f)     Stebbins v. Legal Aid of Arkansas, Case No. 11-3057 in the U.S. District Court for the Western District of Arkansas. This lawsuit was filed in good faith because they refused to represent Plaintiff in "any matter" because Plaintiff had apparently said something they did not like, and much like Jason Jones before them, they refused to take into consideration Plaintiff's Asperger Syndrome by providing the VERY reasonable accommodation of allowing Plaintiff to apologize for whatever it was that upset them.

(g)     Stebbins v. Harp & Associates, LLC, Case No. 11-3078 in the U.S. District Court for

the Western District of Arkansas. This lawsuit was filed in good faith because the Defendants evicted Plaintiff because of all the aforementioned lawsuits previously listed in this Exhibit. Plaintiff sued Harp & Associates in that case for much the same reason he is suing the State of Arkansas in this one.

### Sub-Section 2: Adverse Actions by Russel Rogers

14. After Plaintiff posted bail to be released from pre-trial incarceration following an arrest, Plaintiff proceeded to file a lawsuit in Boone County Circuit Court against the alleged victim of Plaintiff's charge – his father, David Dwayne Stebbins1 – for seven (7) claims, including the common law tort of malicious prosecution. The case was given Case No. CV2012-85-4, and was assigned to Boone County Circuit Judge Gordon Webb. Plaintiff sought $11,000,000 in damages.

15. To make a long story short (details can be provided on this matter during litigation if they are required), Judge Webb issued a letter to the parties in the case explaining that he was recusing himself. The letter was dated on November 25, 2013, and it stated that he would petition the Arkansas Supreme Court for a special judge if no other judges in the 14th Judicial Circuit (of which Boone County is a part of; see A.C.A. § 16-13-2201) were either unwilling or unable to take the case.

16. After approximately a month's time, Gordon Webb proceeded to file the promised Petition with the Arkansas Supreme Court on the date of December 31, 2013.

17. Eight days later, on the date of January 7, 2014, Jim Hannah – in his official capacity as Chief Justice of the Arkansas Supreme Court – issued an order simultaneously granting Gordon Webb's petition for leave to recuse and appointing semi-retired judge David Clinger to preside over the case.

18. Everything seemed to be going smoothly, until the middle of June, 2014, David Clinger

asked to himself be relieved of this assignment, citing some sort of "family emergency." Thus, on June 20, 2014, Jim Hannah – acting in his official capacity as Chief Justice of the Arkansas Supreme Court – relieved Clinger of the assignment. However, unlike before, this was not accompanied by a replacement appointment.

19.  Plaintiff waited patiently for a new judge to be appointed to the case. And he waited. And waited. For a total of a whopping 108 days (that's 13½ times the amount of time it previously took to get David Clinger on the case), Plaintiff patiently waited for a new judge to be appointed. However, no news came. Plaintiff never even got so much as an indication that the Administrative Office of the Courts was even trying to find a new judge to replace Clinger.

20.  Thus, finally, on October 6, 2014, Plaintiff had had enough. He called the Arkansas Administrative Office of the Courts and asked what was taking so long. After being re-directed about a half a dozen times, Plaintiff was advised that the person he needed to speak to was named "Donna Gay." He called back about fifteen minutes later, after Ms. Gay had an opportunity to enter her office, and then he spoke to her.

21.  She offered no excuses, no explanation as to why it was taking nearly four whole months to find a new judge, saying only that it "just was."

22.  Plaintiff subsequently advised her that, as an administrative officer (and not a judicial one), she is not entitled to absolute immunity from suit; thus, if she does not do her job, consequences can and will attach. Immediately after this warning, she pledged that she would find a new judge as quickly as possible.

23.  Literally ONE DAY LATER, on October 7, 2014 (after a whopping 109 days of waiting), Donna Gay submitted an email to Plaintiff which contained an attachment. This attachment was an order from Jim Hannah appointing Russel Rogers onto the case.

24. Russell Rogers, however, completely ignored Plaintiff's constitutional or statutory rights. Plaintiff does not know if this animosity came from political pressure, or if Rogers just personally found Plaintiff to be annoying. That is not important; what is important is ... he made it perfectly clear that he did not like Plaintiff (for whatever reason), and he was going to use his disdain towards Plaintiff to ensure that Plaintiff did not win his case.

25. Examples of things he did without any legal authority, or clearly out of animosity towards Plaintiff, include, but are not limited to, the following:

- He denied Plaintiff's "Motion to Always Read the Law in Future Motions." This motion was designed to ensure that whichever judge got assigned to Plaintiff's case would actually FOLLOW the law, and not use his judicial immunity to his advantage. Although Plaintiff suffered no prejudice, just on this alone, it set the stage for everything else to come.

- He dismissed, with prejudice, five of Plaintiff's seven claims. There was no motion to dismiss pending, and he never even ATTEMPTED to give any grounds for why they were being dismissed. He was dismissing them because ... he did not think Plaintiff deserved his day in court. He wasn't even PRETENDING like it was more than that.

- He denied Plaintiff his right to discovery, simply on the grounds that Plaintiff's discovery requests were "confusing" and "unlikely to lead to admissible evidence." He never explained his decisions, or attempted to talk to Plaintiff about the alleged confusions.

- He denied Plaintiff's motions for summary judgment, claiming that the facts were still disputed, when the Defendant had admitted to said facts in response to a Request for Admissions.

- He declined to rule on the admissibility of any evidence until jury trial. This caused

potentially inadmissible evidence to still be heard by the jury. He did this, simply out of a desire to ensure that Plaintiff had as difficult a time as possible

- Right before the jury trial (which, for the record, he forced Plaintiff into before Plaintiff had enough time to prepare), when a witness had not appeared, even though he never moved to quash his subpoena, he declined to send out a search party for that person, simply on the grounds that he personally did not consider this witness's testimony to be necessary. In other words, he was usurping the position of "Plaintiff's counsel" and deciding litigation strategy on Plaintiff's behalf.

- Speaking of trying to decide litigation strategy on Plaintiff's behalf, when the trial got underway, and when Plaintiff was giving his own direct examination, he allowed the Defense Counsel (named Jim Goldie) to constantly interrupt Plaintiff's testimony and try to develop Plaintiff's testimony for him. He consistently tried to suggest evidence that Plaintiff should testify about, rather than waiting for his turn to conduct crossexamination. Judge Rogers allowed this, despite Plaintiff's protests, and specifically BECAUSE it prejudice Plaintiff.

- Also during trial, he repeatedly allowed the Defense Counsel to introduce clearly inadmissible evidence (such as hearsay evidence, evidence of prior acts that Plaintiff allegedly did, etc.) simply on the grounds that Plaintiff had already introduced these exhibits at some point in the litigation. The Judge offered this evidence in direct violation of Arkansas Rule of Evidence 105 ("Whenever evidence which is admissible as to one [1] party or for one [1] purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly").

- Perhaps the worst example of this came during Day 2 of the trial. When conducting direct examination of the Defendant himself, the Defense Attorney used the forensics report that Plaintiff introduced to show evidence that somebody – who wasn't even called as a witness at that trial – had told somebody else, over the phone, that Plaintiff had acted in a way that person considered to be excessively violent, and for that matter, did not even give any specific instances of conduct, only that Plaintiff was violent with that person. What was already heavily opinionated and conclusory was made even more inadmissible by the fact that it was not merely hearsay, but hearsay within hearsay.
- Another good example came during Plaintiff's cross examination. When his attempts to get Plaintiff to testify to the University of Arkansas' hearsay accusations that Plaintiff had formulated some "grand scheme" to murder his father four years in the making, he brought it up on cross examination. Plaintiff objected to this evidence on the grounds that A) it was hearsay, and B) it was inadmissible under ARE Rule 404(b)2. At first, Goldie asked Plaintiff to simply admit that it was there, "whether it's true or not," suggesting that he had some other plans for this evidence, beyond simply to prove the truth of the matter asserted. However, later in that trial, when Plaintiff was trying to introduce some similar evidence, Goldie freely admitted that he introduced that evidence for the express purpose of showing that the Plaintiff held a vendetta against the Defendant, meaning that he introduced the hearsay evidence for the purpose of proving the truth of the matter asserted.
- All the while, in all the times the Defense Counsel did this, he never even so much as ATTEMPTED to offer any evidence that any one of these hearsay accusations were

true. The Defense Attorney's only argument for being allowed to show this evidence was "HE brought it up!" His argument was that, if Plaintiff introduces an exhibit for one purpose, then the Defense Attorney is allowed to use that exhibit for whatever purpose he likes, even if it would be inadmissible for that purpose otherwise. Moreover, he spoke as if this was well-established law; like it was common knowledge among legal circles, and that anyone who had a legal education regarded this legal doctrine as second-nature. Quite frankly, Rule of Evidence 105 says the complete opposite.

- The Defense Attorney objected to numerous exhibits that Plaintiff attempted to introduce. However, he did not state any grounds for why the evidence should be inadmissible. Instead, he argued that the evidence did not prove what Plaintiff claimed it to prove. He then asked the Court – not the jury, but the Court – to decide which side the evidence favored. This was a clear abuse of judicial authority. By the judge's own admission, when it was instructing the jury on the law, it is the JURY'S job, not the judge's, to determine the weight of the evidence.
    - Plaintiff was most heavily prejudiced on this matter when he attempted to introduce written threats made by the Defendant – either the Defendant himself, or through counsel – threatening to collaborate with the government to deny Plaintiff access to the courts. The Defense Attorney offered his own take on the matter, and the Court simply decided that, since he personally did not believe that the letters proved what Plaintiff offered them to prove, the jury was not going to get the opportunity to disagree with it.
- Despite all of this, the Defendant himself (as opposed to, the Defense Counsel) actually

ADMITTED to every single underlying fact that was necessary to support the two claims that remained. Despite this admission, Rogers refused to grant Plaintiff's Motion for Directed Verdict, simply calling it a "fact question," even though, you know, the Defendant ADMITTED TO IT! He never even attempted to explain his ruling beyond that. It was a fact question; just shut up and accept the Judge's biased decision like a little punk.

26. So Plaintiff conducted his jury trial to the best of his abilities. As the Court may have guessed, he lost his case, when he was unable to show some of his most probative evidence, and the Defense was allowed to lay down exhibit after exhibit of hearsay evidence in order to stir up resentment amongst the jury.

27. Feeling that there was no justice in the world, Plaintiff retired to his apartment, expecting to never leave that place. Why, you ask? Because as soon as he got home, he took off his shirt and proceeded to ingest and entire Powerade bottle full of bleach. He did not WANT to live in a world where judges could simply ignore the law if they felt like it.

28. To make a long story short, Plaintiff's life was saved. He was taken to a hospital in Jonesboro and diagnozed with Clinical Depression.

29. Plaintiff proceeded to file an appeal in that case. However, despite the appeal being ready for a ruling for over half a year by now, the case appears to have been shelved by the Arkansas Court of Appeals. It will probably stay that way, still officially open, but never have a ruling issued in it, for all eternity. If Plaintiff petitions the Arkansas Supreme Court for a writ of mandamus to force a ruling, it will probably be denied with no explanation.

30. Even if the Arkansas Court of Appeals does issue a ruling, it will probably just be a summary affirmation of the circuit court judgment; if not legally, they will do so illegally. They

will just rule against Plaintiff, period, and tell him that he lost ... and then the judges will tell him to shut up, or he'll be sent to jail for contempt of court.

### Sub-Section 3: Causal Connection for Rogers' Adverse Actions

31.   Russel Rogers has openly admitted, in writing, that he committed these adverse actions primarily out of personal disdain for Plaintiff.

32.   In an order denying Plaintiff's First "Motion for Judgment NOV or in the Alternative for New Trial," Rogers stated he was denying the motion in part because "[plaintiff] uses his medical condition [of Aspergers], if such even exists, as a weapon." Even if this were true (which it is not), this is not a defense to retaliation in violation of Sec. 503 of the Americans with Disabilities Act. See *Shaver v. Independent Stave Co.*, 350 F. 3d 716, 723-25 (8th Cir. 2003). So, Rogers might as well have been retaliating against the Governor for using the power of veto as a "weapon." Even if it were true, Plaintiff is still within his rights. "To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." See *Bordenkircher v. Hayes*, 434 US 357 (1978).

33.   Second, after it was revealed that the Defense in that case had engaged in ex parte communications to win his case, rather than litigating the matter honorably, Plaintiff demanded that the Defense attorney be punished for breaking the law. When Rogers refused to issue any punishments, he gave the reasons why he would not do so. These reasons included the following statement: "The Plaintiff is suffering from a condition that I believe (from over 40 years of dealing with disturbed people) is more serious than Aspergers alone."

34.   In other words, he is openly admitting that he is discriminating against Plaintiff simply because he believes Plaintiff has a disability. He isn't even pretending like there is anything more to it than that.

**Sub-Section 4: The adverse actions by Brad Karren**

35. On June 24, 2015, Special Judge Brad Karren – who is normally a circuit judge in Bentonville – was assigned, by the Arkansas Administrative Office of the Courts, as special judge in Case No. CV2015-38-4 in the Boone County Circuit Court, in which Plaintiff was also a pro se party. In that case, Plaintiff sought $159,064,027.71 in total damages. The order of assignment made it perfectly clear that he had no authority in the Boone County Circuit Court beyond that one specific case.

36. On August 4, 2015, a motions hearing was held in that case. He had arranged for the Boone County Circuit Clerk to be present at the hearing. Also, when Plaintiff entered the courtroom for the hearing, he noticed that the two defense attorneys were seated at the Plaintiff's table, rather than the defenses. Remember that point: It does not appear important at first, but it will become important later on.

37. After oral argument, Karren freely admitted to having looked up Plaintiff's litigation history on PACER. He then proceeded to dismiss the Plaintiff's complaint, with prejudice. Officially, he did so on the grounds of collateral estoppel, a grounds not even raised by the Defense prior to the evidence hearing.

38. He then proceeded to act entirely outside of his jurisdiction, usurp the position of Administrative Judge of the 14th Judicial Circuit, and bar Plaintiff from filing any more pro se lawsuits in the Boone County Circuit Court. He did this in complete defiance to the order assigning him to the case, which stated that he had no power in the 14th Judicial Circuit except to the extent it applied to that one case.

39. He explained that the reason he asked the Clerk to be present for the hearing was so she could be aware of this particular sanction.

40. Plaintiff begged the judge for an opportunity to be heard, as he was entitled under Rule 11(c)(6) of the Arkansas Rules of Civil Procedure, but he replied with a one-word answer: "No."

41. He then stormed out of the courtroom without hearing another word. He refused to give Plaintiff even ONE SECOND to argue his case.

42. On August 5, 2015, Plaintiff filed a Motion for Reconsideration. However, Brad Karren struck that motion from the record on the grounds that it was filed pro se, in violation of his order that the Clerk not accept any pro se filings from Plaintiff.

### Sub-Section 6: Causal Connection for Rogers' Adverse Actions

43. First of all, the Defense attorneys were stationed at the Plaintiff's desk. This does not appear, at first glance, to be a constitutional violation. The problem is that there is only one way the two attorneys could possibly have known they were supposed to do that, and that is if they had an ex parte communication of their own.

44. Second, there is only one conceivable *motivation* for wanting to switch it around. They wanted Plaintiff to know that there was an ex parte communication (using the logic explained in the previous paragraph), and, upon figuring that out, to know that it does not matter what the facts or written law are; when you're suing the government, the government wins. Period. Even if they are not immune from suit, even if they are clearly guilty, the judge will still make sure they win. If not legally, they will do so illegaly (such as ... via ex parte communications), regardless of what your rights are.

45. But that only matters if the adverse action was done because of Plaintiff's statutorily protected activities. Otherwise, the claim would only be cognizable under 42 USC § 1983, and then, it would be dismissed for 11th Amendment and/or judicial immunity.

46. With that said, keep in mind that Karren admitted to looking up Plaintiff's litigation

history on PACER. Therefore, he knew about Plaintiff's statutorily protected activities. Upon that being established, the odds are a million to one that he factored these statutorily protected activities into his decision, because judges do not prospectively bar a litigation from court access simply because of one case. The odds are a million to one that Karren issued that decision out of retaliatory animus.

47. With that established, the preponderance of the evidence is also clearly in Plaintiff's favor that these statutorily protected activities were also a contributing factor in Karren's decision to dismiss that one case with prejudice. He did not state that reason out loud, like Russel Rogers did, but the odds that it was not a contributing factor in the dismissal is one in a million. Million to one odds say that the dismissal was pretextual.

## SECTION IV: THE LAW

### Sub-Section 1: Prima Facie Showing of Discrimination

48. To make a valid prima facie case of disability discrimination, Plaintiff must sufficiently allege the following facts: (A) That Plaintiff is disabled, (B), that Plaintiff is, but for the disability, otherwise qualified for a particular service, (C) That Plaintiff was denied the service specified above, and (D) that the denial was based, at least in part, because of the Plaintiff's disability. See Wooten v. Farmland Foods, 58 F. 3d 382, 385 (8th Cir. 1995).

49. As of the ADA Amendments Act of 2008, the Plaintiff does not have to actually have a disability in order for Essential Element (b) to be satisfied. As long as the Defendants believe that Plaintiff has a disability, he is considered "disabled" for purposes of being entitled to recovery under disability discrimination. See 42 U.S.C. § 12102(1)(C).

50. Russel Rogers states that he believes Plaintiff is disabled. This satisfies the first essential element: Having (or being regarded as having) a disability.

51. The first judge in the malicious prosecution lawsuit to which Russel Rogers was assigned granted Plaintiff leave to proceed in forma pauperis; under Arkansas state law, this required a finding that Plaintiff had a colorable cause of action; see Ark.R.Civ.P. 72. Also, the Defendant in that case admitted, in court, to all the essential elements for the two claims he was still being sued for after Rogers sua sponte dismissed the rest of the complaints. These two things satisfy the second essential element: That Plaintiff was otherwise qualified to receive the government services he requested (specifically, a civil judgment).

52. Plaintiff was denied his due process rights (including, and especially, the right to an impartial judge). This satisfies the third essential element: Denial of government services.

53. In the same order refusing to punish the Defendant for his ex parte communications, in the same order where Rogers stated that he believed Plaintiff was disabled, he also stated that he was not punishing the Defendant *because* of Plaintiff's alleged disability. This satisfies, via confession from the defense, the fourth and final essential element to a claim of discrimination in violation of Title II of the Americans with Disabilities Act.

54. Therefore, Plaintiff has stated a claim upon which relief can be granted.

### Sub-Section 2: Prima Facie Showing of Retaliation

55. "In order to establish a prima facie case of retaliation, a plaintiff must show (1) that he engaged in a statutorily protected activity, (2) that an adverse action was taken against him, and (3) a causal connection between the adverse action and the protected activity." See Amir v. St. Louis University, 184 F. 3d 1017, 1025 (8th Cir. 1999).

56. The factual allegations contained in paragraphs 9-13 are sufficient to plead the first essential element. The court can take judicial notice of these statutorily protected activities.

57. The factual allegations contained in paragraphs 14-30 and 35-42 are sufficient to plead

the second essential element on two counts of retaliation.

58. Since Russel Rogers has confessed to issuing these adverse rulings because of Plaintiff's "use of his medical condition... as a weapon," that means that the element of "causal connection" is established beyond genuine dispute by way of the judge's own admission. The State is left without any affirmative defenses for the reasons stated in Paragraphs 3-8 and Paragraph 32.

59. As stated in paragraphs 45-47, the odds are one in a million that Russel Rogers did not act with retaliatory animus when engaging in the adverse actions spoken of in Paragraphs 35-42. Therefore, the third essential element is also sufficiently plead. The State is left without an affirmative defense for the reasons stated in Paragraphs 3-8.

60. Therefore, Plaintiff has stated a claim upon which relief can be granted.

## SECTION V: DAMAGES AND RELIEF REQUESTED

61. First of all, Plaintiff requests injunctive relief. This injunction should extent, not just to the ARS, but also to the State of Arkansas. Plaintiff asks that the State of Arkansas, in its entirety, be ordered to permanently and perpetually cease and desist its constant, repeated, never-ending pattern of discrimination and retaliation against him. If any officer of the State of Arkansas, or any local government within the State, is ever found to have engaged in any disability discrimination, or retaliation against Plaintiff for his statutorily protected activities, ever again, regardless of the circumstances or context, Plaintiff asks that the State be held in contempt of court for violating this injunction.

62. Second, Plaintiff requests damages. The Defendant's judicial agents (and, by proxy, the Defendant herself; see paragraphs 5-6 of this Complaint) clearly acted with malice. Rogers admitted to acting with malice, while Karren's actions were clearly malicious for the reasons stated in paragraphs 43-44 of this Complaint. Therefore, Plaintiff is entitled to recover damages

for the discrimination and retaliation. See *Meagley v. City of Little Rock*, 639 F. 3d 384 (8th Cir. 2011).

    (a)    Plaintiff requests damages of at least $1,000,000 for the Defendant – acting through her judicial agents – inflicting Plaintiff with severe depression (see Paragraph 28 of this Complaint).

    (b)    He requests $11,000,000 for the loss of the case Rogers was presiding over.

    (c)    He requests $159,064,027.71 for the loss of the case Brad Karren was presiding over.

63.    Therefore, Plaintiff requests a grand total of $171,064,027.71 in total damages.

## SECTION VI: JURY DEMAND

64.    If a trial is needed to determine any facts, Plaintiff demands that the trial be by a jury of his peers.

## SECTION VIII: CONCLUSION

65.    Wherefore, premises considered, Plaintiff respectfully requests that all the relief requested in Section V of this Complaint be granted, costs incurred be awarded, and any other relief to which he may be entitled.

So requested on this, the 31st day of August, 2016.

*[signature]*
David Stebbins
123 W. Ridge St.,
APT D
Harrison, AR 72601
870-204-6516
stebbinsd@yahoo.com